NOTICE

Decision filed 05/08/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260079-U

NO. 5-26-0079

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Christian County. |
| | ) | |
| v. | ) | No. 24-CF-198 |
| | ) | |
| AJANEA M. NETTLES, | ) | Honorable Martin W. Siemer and |
| | ) | Honorable Stanley M. Brandmeyer, |
| Defendant-Appellant. | ) | Judges, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Hackett and Bollinger concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's orders granting the State's verified petition to deny pretrial release and denying the defendant's motion for relief are affirmed.

¶ 2    The defendant, Ajanea M. Nettles, appeals the October 11, 2024, order from the Christian County trial court that granted the State's petition to deny her pretrial release and the December 8, 2025, denial of her motion for relief and immediate release. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    On October 8, 2024, the defendant was charged with predatory criminal sexual assault of a child, a Class X felony. 720 ILCS 5/11-1.40(a)(1) (West 2024). The State filed a verified petition to deny the defendant pretrial release on the same day. The petition alleged that the defendant

1

committed a detainable offense and that she posed a real and present threat to the safety of any person or persons or the community.

¶ 5    The matter proceeded to a hearing on October 11, 2024, and the hearing on the petition to deny pretrial release was held concurrently with the preliminary hearing. The State first called Detective Chase Dickey of the Taylorville Police Department (TPD). Dickey testified that on July 10, 2024, he received a report from Sergeant Adams of the TPD. The report stated that Linday Moomey came to the police department to report a possible sexual assault allegation against her daughter, L.K., born May 31, 2012. Moomey told officers that she observed a note on L.K.'s phone stating that she was molested by an adult female on May 25, 2024, when L.K. was 11 years old. The note stated that "Aja had taken her" virginity that night. Moomey told law enforcement that L.K. and others attended a party on May 25, 2024, at Lake Taylorville. Of the individuals present, the defendant was present with Chuck and Sandra Miller. Dickey testified that the defendant was from Pennsylvania but met the Millers on vacation and stayed in touch. The Millers flew the defendant out for Memorial Day weekend, which was when the offense occurred, and again in July.

¶ 6    Dickey testified that Moomey informed law enforcement that on May 25, 2024, the defendant went to bed in the camper and L.K. "woke up to [the defendant] rubbing her thigh, and then [the defendant] took off L.K.'s pants and molested her in the camper." Dickey scheduled a Child Advocacy Center (CAC) interview with L.K., which he attended on July 18, 2024. During the interview, L.K. stated that the defendant provided her with alcohol, and after the second drink, "she started to get dizzy." L.K. became sick and vomited, then looked for someone to help before deciding to go to the camper to try to go to bed. L.K.'s friends left to go on a golf cart ride, and L.K. did not want to be left alone. Once she was alone, the defendant started "to take care of L.K."

2

During the CAC interview, L.K. stated that the defendant went into the camper and began rubbing L.K.'s leg before removing her shorts. The defendant then placed one hand over L.K.'s mouth and the other on her throat after removing L.K.'s clothes. The defendant was also fully unclothed and interlocked her legs with L.K.'s, resulting in "[the defendant's] vagina rubbing against L.K.'s vagina." L.K. told the CAC interviewer that the defendant stuck her fingers into the vagina of L.K. and touched the outside of it while also kissing her. When L.K.'s friends returned from the golf cart ride, the defendant threw a blanket over L.K., went to the bathroom, and left. During the interview, L.K. stated that the defendant knew she was young, telling L.K. that she was "too young to be drinking" while on a boat, at which point L.K. told the defendant she was 11 years old.

¶ 7    Detective Dickey stated that he obtained the defendant's information from the Millers and determined that the defendant was still living in the area rather than returning to Pennsylvania. Detective Todd of the TPD made contact with the defendant, and she came in for an interview on October 7, 2024, by Detectives Todd and Dickey. After receiving her *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), Todd asked the defendant if she knew why she was brought in, to which she replied that "it had something to do with L.K." The defendant stated that she was at Lake Taylorville on May 25, 2024, and disclosed that she knew L.K. was drunk because she "was slurring her words and trying to kiss everybody." The defendant said that L.K. stayed back with her while the other girls went on a golf cart ride. The defendant denied going into the Millers's camper and stated that "she only had contact with L.K. in the tent" which was occupied by other individuals as well. The defendant continued to deny ever being alone with L.K. in the camper.

¶ 8    The detectives asked the defendant about the note on L.K.'s phone and whether L.K. made it up, to which the defendant replied, "I am not saying it is not true," but denied interlocking her legs with L.K. When questioned further, the defendant stated that L.K. kissed her and was taking

3

off her clothes, "trying to come on to [the defendant]." The detectives again asked the defendant if she interlocked legs with L.K. while they both had their pants off, which she admitted they did. The defendant told the detectives that she did have "vaginal touching with L.K." but stated it was "consensual." At the time of the offense, the defendant was 20 years old, while L.K. was 11 years old.

¶ 9     Detective Dickey testified that what L.K. stated during the CAC interview and what the defendant stated during her police interview "were consistent" in a "couple instances." The defendant further stated that L.K. attempted to digitally penetrate her, but did not know how to. The defendant said that these events happened in the camper, as L.K. described, not the tent, as she initially stated.

¶ 10     On cross-examination from defense counsel, Detective Dickey stated no other complaints of misconduct had been made against the defendant to his knowledge. Dickey testified that the Millers provided alcohol to the minors at the party. The defendant did not have any contact with L.K. prior to May 25, 2024, and the last time they made contact was the weekend of July 4, 2024. There was no DNA or physical evidence in the case. The defendant also indicated that she was intoxicated on May 25, 2024.

¶ 11     On redirect, Dickey testified that on July 9, 2024, Moomey indicated that L.K. was displaying suicidal ideations, her demeanor changed, she dressed differently, and she was self-harming using a razor. This report came five days after the last time the defendant made contact with L.K. The behaviors started after the May 25 incident, and the behaviors heightened after the July 4 contact. During the weekend of the Fourth of July, the Millers hosted another party at Lake Taylorville, and L.K. told her parents that she did not want to go. When she did attend, she wore a sweatshirt and pants, then sat by herself for most of the party.

4

¶ 12    On July 8, 2024, L.K. left home without informing her parents and walked five miles to Walmart. When she arrived, she asked an elderly lady at the store to use the phone, then called 911 and only said, "[H]elp." When L.K.'s parents called 911 to report her missing from home, the police had already made contact with her at Walmart. Dickey testified that based on this behavior, L.K. had changed after the May 25 offense and July 4 contact. Dickey stated that the defendant moved to Illinois from Pennsylvania because the Millers "took her in" due not having "the best family life."

¶ 13    The trial court found there to be probable cause that the defendant committed the underlying offense based on Detective Dickey's testimony. The matter then proceeded to the pretrial detention portion of the hearing. The State confirmed that it was relying upon Dickey's testimony for the detention hearing as well.

¶ 14    The State proceeded, asserting that the proof was evident and the presumption great that the defendant committed a detainable offense based on the testimony provided by Detective Dickey described above. The State specifically said that the defendant was 20 years old at the time of the offense, and L.K. was 11 years old. The defendant was aware of L.K.'s age, and admitted she knew how old L.K. was. The defendant admitted that she interlocked her legs with L.K.'s while unclothed and placed her vagina on L.K.'s vagina.

¶ 15    The State argued that the defendant posed a real and present threat. The offense was a sex offense, and L.K. would be at risk if the defendant was released. The testimony presented showed that L.K. was traumatized by this incident, even running away from home and expressing suicidal ideations by physically harming herself. The defendant had no criminal history to the State's knowledge. The State argued that the defendant displayed assaultive and violent behaviors during

5

the offense, which was shown by placing her hands over L.K.'s mouth and throat during the offense. The State argued that

> "one factor that is of most concern for the State is that [the defendant] has no contact with the State of Illinois but for [the Millers]. However, she moves upwards of a thousand miles to Illinois to a specific spot where this incident is alleged to have occurred. She has no contacts here. She doesn't have any family here. But she puts herself back in the situation of being a potential contact with L.K."

¶ 16    As to conditions, the State argued that conditions such as electronic monitoring or house arrest would not be appropriate. The defendant could "have continual access to allowing other individuals, minors into her home without any supervision." As such, the State asked for the defendant to be detained.

¶ 17    Defense counsel proceeded to argument, stating that the defendant did not pose a flight risk. As to the real and present threat posed by the defendant, defense counsel argued that the defendant had no criminal record or any misconduct prior to May 25, 2024. There had been no additional contact between the defendant and L.K. since the case was reported. This was an isolated incident, and the defendant did not pose a threat to anyone. Defense counsel argued that L.K.'s family was now aware of the offense and her family "will and has the primary duty to protect the child." Defense counsel said that the offense was a "crime of opportunity" as it happened due to the defendant and L.K. consuming alcohol. It did not involve targeting or grooming. Due to the nature of the offense being isolated and one of opportunity, it did not reflect that the defendant was a threat to anyone else in the future.

¶ 18    Defense counsel argued that conditions did not have to ensure the safety of the public, but instead mitigate the real and present threat. Electronic home monitoring and police checks could

6

mitigate the defendant's risk. She additionally had an employment opportunity prior to her arrest. She had an apartment in the area as well and was in a relationship with a young man. The defendant had the lowest score on the pretrial assessment report category for risk of reoffending. Defense counsel asked that the defendant be released with conditions.

¶ 19 The trial court stated that it considered the evidence presented during the preliminary hearing to find probable cause. The trial court said that it did not consider any factors as to willful flight, as the State did not allege it in its verified petition. As to dangerousness, the trial court stated that it considered that it was a very serious crime, that L.K. reported that the defendant placed her hands over L.K.'s mouth and throat, which was indicative of violent or abusive behavior. The defendant had no recorded criminal history. The trial court stated that there was "some threat" to L.K., and the evidence presented showed the threat to be ongoing despite no additional contact with L.K., as the defendant posed a threat to the community in similar circumstances. The trial court additionally said that the defendant "indicate[d] some level of admission as to the acts alleged, and they go to the very heart of the offense if those admissions are to be believed." The trial court noted that L.K. was 11 years old at the time of the offense and was on a "downhill slide" from the offense. No evidence was presented as to whether the defendant had access to any weapons. The defendant was not on probation, parole, or mandatory supervised release, which was in her favor. The trial court stated it considered the fact that the defendant moved to the area from Pennsylvania after the offense and maintained connections to individuals with connections to L.K.

¶ 20 The trial court found that the State proved, by clear and convincing evidence, that the proof was evident or presumption great that the defendant committed a detainable offense, being predatory criminal sexual assault of a child. Weighing the factors of the case, the trial court found that the defendant posed a real and present threat to the safety of L.K. or the community. Finally,

7

the trial court considered the evidence against and in favor of the defendant as to conditions, and found that no conditions could mitigate the defendant's real and present threat. The trial court granted the State's petition and entered a written order the same day.

¶ 21 Defense counsel filed a motion for relief on November 12, 2025. The motion asserted that the State failed to prove by clear and convincing evidence that the defendant posed a real and present threat and that no conditions could mitigate the threat. Specifically, the State "relied almost exclusively on its factual proffer concerning the elements of the allegations." The defendant argued that she did not insert herself into the Taylorville community, but was only in the community due to her relationship with the Millers. As such, the trial court should not consider this as a factor. Further, conditions could mitigate any risk, such as the defendant moving back to Pennsylvania to live with her grandmother and obtain a sex offender evaluation.

¶ 22 The matter proceeded to a hearing on the motion on December 8, 2025. Defense counsel argued that the defendant's threat could be mitigated by moving back to Pennsylvania. Further, the defendant "did not by her own volition insert herself into Christian County, Illinois. She was essentially inserted here by these Millers that her family believes had a nefarious purpose in bringing her out here to Illinois." Permitting the defendant to move back to Pennsylvania would mitigate any threat or proximity to L.K. Defense counsel argued that the defendant should be released on conditions, such as weekly Zoom contact with pretrial services and specific conditions of compliance verification.

¶ 23 Defense counsel also argued that there had been a change in circumstances. Specifically, through discovery, the defendant learned that L.K. suffered from preexisting mental health issues. The State objected to this argument, asserting that this was not a change in circumstances for the defendant. Defense counsel continued, arguing it was a change in circumstances and that a third-

party adult was interviewed who overheard "juveniles talking about self-harm" during the May 25, 2024, party. Defense counsel argued that the defendant's threat was mitigable and that she could reside in Pennsylvania.

¶ 24    The State argued that there was no relevant information that was put forth that was not known to the trial court at the time of the original detention hearing that would change or mitigate the inherent danger that the defendant presented to the victim and the community.

¶ 25    The trial court stated that it reviewed the initial detention hearing and subsequent order. The trial court found the initial detention order to be appropriate and stated that "the allegations about returning to the State of Pennsylvania" were not considered at the initial hearing and would have required a willful flight analysis. The trial court denied the motion. The defendant appealed.

¶ 26                                   II. ANALYSIS

¶ 27    On appeal, the defendant argues that the State failed to prove that she posed a real and present threat and that no conditions existed to mitigate the alleged threat posed. Specifically, the trial court erred in making generalized conclusions as to both the threat posed and conditions.

¶ 28    Pretrial release—including the conditions related thereto—is governed by Public Act 101-652, § 10-255 (eff. Jan. 1, 2023). See Pub. Act 102-1104, § 70 (eff. Jan. 1, 2023) (amending various provisions of the Act); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (lifting stay and setting effective date as September 18, 2023). A defendant's pretrial release may be denied only in certain statutorily limited situations. 725 ILCS 5/110-6.1 (West 2024). Upon filing a timely, verified petition requesting denial of pretrial release, the State has the burden to prove by clear and convincing evidence that the proof is evident or the presumption great that the defendant has committed a qualifying offense, that the defendant's pretrial release poses a real and present threat to the safety of any person or the community or a flight risk, and that less restrictive conditions

9

would not avoid a real and present threat to the safety of any person or the community and/or prevent the defendant's willful flight from prosecution. *Id.* § 110-6.1(e), (f). The State or the defendant may present evidence to the trial court by way of proffer based upon reliable information. *Id.* § 110-6.1(f)(2). The trial court may order a defendant detained pending trial if the defendant is charged with a qualifying offense, and the trial court concludes the defendant poses a real and present threat to the safety of any person or the community (*id.* § 110-6.1(a)(1)-(7)) or there is a high likelihood of willful flight to avoid prosecution (*id.* § 110-6.1(a)(8)).

¶ 29    Our standard of review of pretrial release determinations is dependent on whether the trial court heard live witness testimony or whether the parties proceeded solely by proffer or submission of documentary evidence. Where the parties to a pretrial detention hearing proceed solely by proffer or submission of documentary evidence, this court stands in the same position as the trial court and may conduct its own independent review of the proffered evidence, thus reviewing the record *de novo*. *People v. Morgan*, 2025 IL 130626, ¶ 54. However, where the trial court is asked to consider the testimony of live witnesses, and make factual findings, such as the State's burden of presenting clear and convincing evidence that conditions of pretrial release would not protect any person or the community, that the defendant has a high likelihood of willful flight to avoid prosecution, or that the defendant failed to comply with previously ordered conditions of pretrial release, our review is under the manifest weight of the evidence standard. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). Given the live testimony presented at the detention hearing in this matter, we will employ a manifest weight of the evidence standard.

¶ 30 The court is provided a nonexhaustive list of factors it should consider when determining whether a defendant poses a real and present threat to the safety of any individual(s) or the community. Those factors include (1) the nature and circumstances of the offenses charged, including whether they are crimes of violence or involve a weapon; (2) whether the defendant's prior criminal history indicates "violent, abusive, or assaultive behavior, or lack of such behavior"; (3) the identity of any individual to whose safety the defendant may pose a threat and the nature of any such threat; (4) the defendant's age and physical condition; (5) the age and physical condition of the victim or complaining witness; (6) whether the defendant possesses or has access to any weapons; (7) whether the defendant was on probation, parole, or mandatory supervised release when arrested on the underlying charges or any other offense; and (8) any other factor that has a reasonable bearing on the defendant's propensity for violent, abusive, or assaultive behavior. 725 ILCS 5/110-6.1(g)(1)-(9) (West 2024) No one factor is determinative, and the court must base its decision on an individualized assessment. *People v. Atterberry*, 2023 IL App (4th) 231028, ¶ 15 (citing 725 ILCS 5/110-6.1(f)(7) (West 2022)).

¶ 31 Once a court determines that the defendant poses a threat to the safety of any individual or the community, the trial court must determine whether the State has met its burden of proving by clear and convincing evidence what pretrial release conditions, "if any, will reasonably ensure the appearance of a defendant as required or the safety of any other person or the community and the likelihood of compliance by the defendant with all the conditions of pretrial release." 725 ILCS 5/110-5(a) (West 2024). In reaching its determination, the trial court must consider (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant;

11

(3) the history and characteristics of the person;[1] (4) the nature and seriousness of the specific, real, and present threat to any person that would be posed by the person's release; and (5) the nature and seriousness of the risk of obstructing or attempting to obstruct the criminal justice process. *Id.* § 110-5(a)(1)-(5). The Code of Criminal Procedure of 1963 (Code) lists no singular factor as dispositive. See *id.* § 110-5(a). The nature and circumstances of the underlying offense is "just one factor to consider in determining whether the threat posed can be mitigated by conditions of release." *People v. Lopez*, 2025 IL App (2d) 240709, ¶ 19.

¶ 32     We have thoroughly reviewed the record on appeal in this matter, including the initial detention hearing and the motion for relief hearing. The defendant was charged with predatory criminal sexual assault of a child, a Class X felony. Detective Dickey testified to the allegations of the offense, including that the defendant provided alcohol to the 11-year-old victim, approached her while alone, went into the camper with her, and removed the victim's clothing while holding a hand over her mouth and later throat before sexually assaulting the victim. The defendant then left L.K. naked and covered with a blanket when others returned to the camper before leaving herself. The defendant later admitted these actions to law enforcement, stating it was "consensual," despite knowing L.K.'s age.

¶ 33     The trial court found that the defendant posed a real and present threat to L.K. and the community. The record shows that the trial court made individualized findings based on the evidence presented during the hearing rather than relying upon the bare allegations of the offense,

---

[1]The defendant's history and characteristics include: "the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past relating to drug or alcohol abuse, conduct, *** criminal history, and record concerning appearance at court proceedings," as well as "whether, at the time of the current offense or arrest, the defendant was on probation, parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal law, or the law of this or any other state." 725 ILCS 5/110-5(a)(3)(A), (B) (West 2024).

as argued by the defendant. The charge is a sex offense, which the Code explicitly states may be considered when determining dangerousness. See 725 ILCS 5/110-6.1(g)(1) (West 2024).

¶ 34 In addition to the nature and circumstances of the offense, the trial court stated that it considered other factors. These factors included that the defendant exhibited violent, abusive, or assaultive behavior when the defendant placed her hand over L.K.'s mouth and the other over her throat (*id.* § 110-6.1(g)(2)(B)); that L.K. was identified as the victim and the defendant posed a threat to her safety (*id.* § 110-6.1(g)(3)); that the defendant admitted to the offense (*id.* § 110-6.1(g)(4)); and that L.K. was 11 years old at the time of the offense, and suffered a "downhill slide" since the offense, including running away from home and instances of self-harm (*id.* § 110-6.1(g)(6)). Additionally, as to any other factors the trial court could consider, the trial court addressed that after the May 25, 2024, offense, the defendant permanently moved to the Taylorville, Illinois, area, away from her home in Pennsylvania. *Id.* § 110-6.1(g)(9).

¶ 35 The trial court clearly relied upon factors outside of the nature and circumstances of the offenses themselves. An opposite conclusion is not clearly evident, and the finding itself is not unreasonable, arbitrary, or unsupported by the evidence presented. As such, it was not against the manifest weight of the evidence for the trial court to find that the defendant posed a real and present threat to the community or the victim.

¶ 36 The defendant also argues that the State failed to prove that conditions or a combination of conditions could not mitigate the threat posed by the defendant. Sufficient conditions could include electronic home monitoring or moving back to Pennsylvania.

¶ 37 The defendant asserts that she could reside with her grandmother in Pennsylvania, which would mitigate any threat posed to L.K. and attend court hearings by Zoom. This condition, however, was not offered during the initial detention hearing and would place the defendant

outside the jurisdiction of the State of Illinois. See *id.* § 110-10(b)(0.05) (conditions of pretrial release may include that a defendant shall not depart the state without leave of court).

¶ 38 As to electronic home monitoring, the record shows that the defendant was aware of L.K.'s age of 11 years when the offense was committed, yet still engaged in sexual assault. The defendant committed a "crime of opportunity," as she asserts, with an 11-year-old she provided alcohol to while attending a gathering. While electronic home monitoring was available and would indicate the defendant's location, it would not show if the defendant was in the presence of a minor to commit another "crime of opportunity." See *People v. Willenborg*, 2023 IL App (5th) 230727, ¶ 20 ("[T]he electronic monitoring device would not indicate defendant's proximity to the minor. Moreover, there is no way to ensure that the defendant would comply" with a restriction to stay away from minors.).

¶ 39 Based on these facts, the trial court found that no condition or combination of conditions, including electronic monitoring, could reasonably mitigate the danger the defendant posed to the victim and the community. An opposite conclusion is not clearly evident, and the finding itself is not unreasonable, arbitrary, or not based on the evidence presented. Therefore, we find that the trial court's decision to detain the defendant was not against the manifest weight of the evidence. *Morgan*, 2025 IL 130626, ¶¶ 38, 43.

¶ 40                                III. CONCLUSION

¶ 41 Based on the foregoing reasons, we affirm the trial court of Christian County.

¶ 42 Affirmed.